IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC DEFENDER SERVICE FOR THE DISTRICT OF COLUMBIA<br>633 Indiana Avenue, NW<br>Washington, DC 20004,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530,<br><br>Defendant. | CIVIL ACTION |

## COMPLAINT FOR INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, for injunctive and other appropriate relief. It seeks the immediate disclosure and release of agency records that have been improperly withheld from public disclosure by components of defendant United States Department of Justice.

2. The records at issue are of paramount public importance. They reveal the identity, including the name, age, criminal history and physical appearance, of the convicted sex offender who likely committed the brutal armed rape, sodomy and burglary on February 24, 1981, for which Kirk L. Odom was wrongfully prosecuted and wrongfully convicted. No concern of the criminal justice system is more vital than that "guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 888 (1935). And yet guilt has escaped and innocence did suffer for more than thirty years. Mr. Odom was completely

exonerated and issued a certificate of actual innocence in July 2012 when DNA testing in response to motions brought by the Public Defender Service under the District of Columbia Innocence Protection Act proved to a scientific certainty that he was actually innocent. The expiration of the statute of limitations bars prosecution of the convicted sex offender linked by DNA to the crimes.

3.  From the wrongful conviction and exoneration of Mr. Odom, including those records which show who the real rapist likely was, the public has an opportunity to learn what went wrong, whether other innocent men were also wrongfully convicted, and what reforms may prevent a recurrence of the manifest injustice that was visited upon Mr. Odom by the United States Department of Justice and its components.

4.  The Executive Office of the United States Attorney, in response the Public Defender Service's FOIA request, withheld these records on the basis of the purported privacy interest of the convicted sex offender whose DNA was linked to the crimes for which Mr. Odom had been convicted, an interest which it claimed was superior to the public interest in disclosure.

5.  The Office of Information Policy affirmed that denial, again citing the purported privacy interest of the convicted sex offender and incorrectly asserting that "any records responsive to [the Public Defender Service's] request would be categorically exempt from disclosure."

6.  The matter is fully exhausted and ready for de novo review by this Court.

### Jurisdiction and Venue

7.  This Court has jurisdiction over this matter pursuant to 5 U.S.C. § 552(a)(4)(B).

8.  Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B).

## Parties

9. Plaintiff Public Defender Service for the District of Columbia ("PDS") is a federally-funded organization dedicated to promoting and providing quality defense services to indigent adults and juveniles in the District of Columbia. Among other responsibilities, PDS provides post-conviction representation to people convicted of crimes in the District of Columbia, including representation under the D.C. Innocence Protection Act, D.C. Code § 22-4131, *et seq.*, with a particular focus on reforming unfair systemic criminal justice practices. PDS represented Kirk L. Odom through his thirty-year search for justice, including at his trial and sentencing, on appeal, in a petition for a writ of certiorari to the United States Supreme Court, and in the proceedings under the Innocence Protection Act that resulted in his exoneration.

10. Defendant United States Department of Justice ("Department of Justice" or "DOJ") is a Department of the Executive Branch of the United States Government. DOJ is an agency within the meaning of 5 U.S.C. § 552(f), is subject to the requirements of FOIA, and includes, *inter alia*, components the Executive Office for United States Attorneys ("EOUSA" or "the Executive Office"), the Office of Information Policy ("OIP"), the Office of the United States Attorney for the District of Columbia ("USAODC"), and the Federal Bureau of Investigation ("FBI"). DOJ component USAODC prosecuted Mr. Odom through his trial and appellate process, and was the agency responsible for answering his motions under the Innocence Protection Act. It is in possession of the requested records. EOUSA is the entity that receives and processes requests for records held by the individual United States Attorney's Offices, including USAODC. EOUSA received and denied the FOIA request at issue in this Complaint. OIP adjudicates administrative appeals of FOIA denials

by EOUSA, including affirming the FOIA denial at issue in this Complaint.

## Facts

### I. Kirk Odom Was Misidentified As The Perpetrator Of A Brutal Attack, Then Wrongfully Prosecuted And Convicted

11. Before dawn on February 24, 1981, a man broke into an apartment near Lincoln Park in the District of Columbia and woke the woman living there by placing a gun to her head. After providing her with a brief view of his face in the dim light, he blindfolded her, gagged her, and bound her hand and foot. He then raped her, sodomized her and burglarized her home before making his escape.

12. When police responded to the scene, they collected physical evidence, including the woman's robe and pillowcases. Police also took the woman's description of the perpetrator: a black male between 20 and 30 years old, between 5'6" and 5'8", clean shaven, with short hair, a wiry build and a medium complexion. She soon clarified the description of her assailant's age, stating that he was "young . . . in his late teens or early twenties."

13. The day after the attack, a police artist worked with the woman to create a composite. The resulting composite depicted a nondescript young black male with no distinguishing features.

14. More than a month later, the police had not made an arrest in the case. At that time, a police officer speaking with 18-year-old Kirk Odom about an unrelated matter decided that Mr. Odom resembled the nondescript composite of the perpetrator.

15. On this hunch, police assembled a highly suggestive photo array containing a photo of Mr. Odom along with photos of nine other men. Eight of the men did not match the description of the perpetrator as young, clean shaven, and short-haired, but were instead older

4

men who were not clean shaven or had various hairstyles. Only one photo other than that of Mr. Odom was of a young, clean-shaven man with short hair.

16. On April 13, 1981, this highly suggestive array was shown to the woman, who tentatively identified Mr. Odom as her attacker.

17. Three weeks later, Mr. Odom was arrested. PDS was appointed to represent him.

18. On May 19, 1981, police again showed the woman the suggestive array in order to refresh her memory. Right afterwards, the police and an Assistant United States Attorney from the USAODC conducted a live lineup for the woman. Mr. Odom was the only person included in both the photo array and the live lineup. Additionally, Mr. Odom was made to stand in the exact center of the seven person lineup in which, as in the photo array, most of the men wore mustaches and/or were visibly older than Mr. Odom. He was also made to stand on a box to make him appear taller than he in fact was. Faced with this second highly suggestive identification procedure, the woman incorrectly identified Mr. Odom as her attacker.

19. Three other women who suffered similar attacks in the same area during the same time period also viewed the lineup. None of them identified Mr. Odom as her attacker.

20. The same day as the lineup, a prosecutor from the USAODC put the woman attacked on February 24, 1981, in front of a grand jury, which returned an indictment against Mr. Odom.

21. At trial, the USAODC presented misleading and unfounded testimony from a FBI hair examiner purporting to corroborate the woman's misidentification of Mr. Odom as her attacker through a claimed match of a hair found on the woman's robe to a sample of Mr. Odom's hair.

22. Mr. Odom took the stand and denied commission of the offenses. He testified that at the time of the rape he was at home, and that the date of the rape was memorable, notwithstanding the gap between the rape and his arrest, because on that day Mr. Odom's sister came home from the hospital with her new born baby. Mr. Odom's mother corroborated his testimony.

23. Mr. Odom was convicted of first degree burglary while armed, rape while armed, sodomy, and armed robbery. On January 6, 1982, he was sentenced to twenty to sixty-six years in prison.

24. PDS attorneys filed an appeal and later a petition for a writ of certiorari to the United States Supreme on behalf of Mr. Odom, focusing on the identification procedures and testimony. Both were unsuccessful.

25. Because the police and the USAODC focused on Mr. Odom and, along with the FBI, brought about his wrongful prosecution and conviction, the true perpetrator was not found or prosecuted before the statute of limitations ran out.

26. Mr. Odom was incarcerated for more than twenty-two years and spent an additional decade on parole for that other man's crimes. In addition, he was forced to register as a sex offender and endure the public opprobrium that comes with that label.

## II. Decades Later, PDS Exonerates Mr. Odom Through DNA

27. Mr. Odom unwaveringly maintained his innocence across the years before finally being vindicated and exonerated in 2012.

28. Mr. Odom's exoneration was the result of PDS's February 14, 2011, motion under the Innocence Protection Act requesting DNA testing in his case.

29. Two days after PDS filed its Motion, the Superior Court ordered the USAODC to

respond. A search of the police evidence warehouse followed, which turned up the robe and pillowcases and the hair collected during the investigation.

30. Analysis of the pillowcases and the robe revealed semen. Nuclear DNA testing proved to a scientific certainty that semen was not from Mr. Odom.

31. Additionally, mitochondrial DNA testing on hair from the scene demonstrated to a scientific certainty that the hair was not Mr. Odom's.

32. Based on these indisputable DNA results, on March 14, 2012, PDS filed a motion to vacate Mr. Odom's convictions and dismiss the indictment with prejudice on the grounds of actual innocence.

33. The USAODC requested the opportunity to conduct additional testing, to which PDS agreed and which confirmed the exclusion of Mr. Odom as the donor of the semen. It also sought the opportunity to upload the DNA profile the laboratory obtained from the semen against the FBI's national Combined DNA Index System ("CODIS") database of DNA profiles to see if it could identify the person from whom the semen came. As USAODC told the court, "in order to fully and fairly assess the merits of [Mr. Odom's] motion, the government believes it must . . . obtain the results of a CODIS search."

34. In addition to marking its own belief that knowing whether CODIS could match the DNA to an individual, and if so, the identity of that individual, was necessary to "fully and fairly" evaluate how Mr. Odom came to be convicted, the USAODC acknowledged Mr. Odom's own right to this information and agreed to share it with him.

35. For instance, on May 24, 2012, the USAODC notified PDS that it needed an additional four week continuance for its response to Mr. Odom's motion to vacate his convictions in order to give it time to upload the profile from the semen into CODIS, and

asked PDS to agree to the continuance. The next day, PDS agreed not to oppose the continuance on the condition that, in return, the CODIS results would be provided to PDS as soon as they were available. That afternoon, the USAODC confirmed by email that it would "share the CODIS results with [PDS] when they're available."

36.   In other communications, representatives of the USAODC made clear that they understood that they were agreeing to share the identity of any person identified in the CODIS results with PDS, noting, for instance, that PDS could use such a person's identity to demonstrate that Mr. Odom had no connection with that person.

37.   The CODIS system matched the DNA from the semen to the DNA profile of a convicted sex offender. On July 10, 2012, after receiving and reviewing the name, the criminal history and other information associated with this convicted sex offender, the USAODC moved to join Mr. Odom's motion to vacate his convictions. It acknowledged that Mr. Odom had been wrongfully convicted and that there was clear and convincing evidence that he was innocent.

38.   However, the USAODC refused to share with PDS the name and identifying information of the person identified by CODIS. Its filing stated only that the semen had come from "a convicted sex offender." The USAODC delayed responding to PDS's inquiries requesting additional information until after Mr. Odom's convictions were overturned. It then incorrectly asserted that since the litigation had ended, it was barred from sharing any additional information.

### III.   The Public Has An Overriding Interest In The Identity Of The Person Identified By DNA As The Likely True Perpetrator Of The Crimes For Which Kirk Odom Was Wrongfully Convicted

39.   The public has a profound and overriding interest in records reflecting the identity of the convicted sex offender identified by DNA testing as the likely true perpetrator of the

8

armed rape and burglary on February 24, 1981, for which Kirk Odom was wrongfully prosecuted and convicted. From these records—which should include such information as the likely true perpetrator's name, age, criminal history and physical appearance—the public has an opportunity to learn what went wrong in Mr. Odom's case, to ensure that other men were not wrongfully convicted for other crimes committed by the same perpetrator, and to avoid future tragedies like the one visited upon Mr. Odom by the actions, oversights, improprieties, policies, procedures, and decision-making of the Department of Justice and its components.

40. The public's interest in avoiding wrongful convictions is manifest and overwhelming. Every wrongful conviction means that—in the public's name—an innocent person is deprived of his or her freedom and suffers the miseries of incarceration, while the true perpetrator remains at large. The public's interest is amply demonstrated in the bestselling books, hit movies and award-winning journalism addressing wrongful convictions. Mr. Odom's specific case has captured the public's attention through reporting by journalists like Carrie Johnson of National Public Radio and the Washington Post's Spenser Hsu, who won the 2012 Scripps Howard Award in Investigative Journalism for his series of articles exposing defendant Department of Justice's use of flawed and unfounded forensic evidence in thousands of convictions, including, as a particular exemplar, Mr. Odom's wrongful conviction.

41. DNA testing has exonerated more than 300 wrongfully convicted persons, including Mr. Odom. Among those cases are many, like Mr. Odom's, in which the likely true perpetrator was identified through a CODIS hit. Yet unlike in his case, those persons were not shielded from public view.

42. In this case, the identity of the convicted sex offender is necessary to evaluate the full extent of the errors, ineffective policies and governmental improprieties that resulted in Mr. Odom's wrongful conviction, including whether there was evidence pointing to the convicted sex offender that the police and the USAODC ignored or discounted.

43. The identity of the convicted sex offender would also help the public understand how to deploy, and how to control and prevent law enforcement misuse of, techniques such as the lineup and photo array procedures that the police and USAODC used in Mr. Odom's prosecution. Such techniques have in recent years come under intense public scrutiny in academic studies, news reports, and cases such as *State v. Henderson*, 27 A.3d 872 (N.J. 2011). The requested records will increase the public understanding of how and why eyewitness identifications and testimony become tainted. For instance, they will reveal whether the convicted sex offender bore any resemblance to either Mr. Odom or to the woman's description of her attacker, which will help the public understand where the investigation went wrong and how the lineup techniques and other actions by law enforcement, including the USAODC, influenced or reinforced the woman's misidentification of Mr. Odom. In turn, this will aid the ongoing public discussion about how to create frameworks for the use of such evidence that minimize the risk of wrongful convictions. Indeed, the requested information may help the public determine the proper course with regard to recently proposed District of Columbia Bill B20-60, The Eyewitness Identification Procedures Act of 2013, which proposes legal requirements for lineup procedures such as those administered in Mr. Odom's case, and which the USAODC has publicly opposed.

44. In addition, the identity of the convicted sex offender may allow the public to

uncover and correct additional wrongful convictions. The convicted sex offender's identity and connection to the February 24, 1981, attack would provide an additional data point in his criminal history that might reveal or confirm his modus operandi and the territory in which he worked. Such information might provide enough of an inference that he, and not someone else, committed particular attacks to cause defense attorneys, prosecutors, judges and police officers to reexamine old cases. This is far from mere speculation: on the day the victim viewed Mr. Odom in the live lineup, there were three other women present who suffered similar attacks in the same area in the months before her rape, none of whom identified Mr. Odom as her attacker.

45.  Given the public's overriding interest in records reflecting the identity of the convicted sex offender identified by DNA testing as the likely true perpetrator of the armed rape, sodomy and burglary on February 24, 1981, FOIA requires that they be made available to the public. 5 U.S.C. § 552. No exemption or other provision of law allows defendant to withhold them.

**IV.   The Public Defender Service's FOIA Request Was Improperly Denied**

46.  On December 4, 2012, pursuant to the FOIA instructions contained on the DOJ website, PDS requested from the EOUSA "copies . . . of all records and documents generated by the Office of the United States Attorney for the District of Columbia that reflect the identity of the person" who the USAODC identified as "a convicted sex offender" in its July 10, 2012 motion. A copy of that request is attached to this complaint as Exhibit 1.

47.  The request explained in some detail how the release of the requested information would benefit the public interest by, *inter alia*, "shedding light on the workings of the police, prosecution and the courts that resulted in the conviction of an innocent man," including the

workings of the USAODC, which prosecuted Mr. Odom.

48. The Executive Office received the FOIA request and assigned it Request Number 12-4833.

49. On January 7, 2013, the Executive Office sent PDS a form letter denying the request and citing the Privacy Act, 5 U.S.C. § 552a, two FOIA exemptions, 5 U.S.C. § 552 (b)(6) and (b)(7)(c), and the convicted sex offender's purported interest in keeping the requested documents private. A copy of the denial letter is attached to this Complaint as Exhibit 2.

50. On February 12, 2013, PDS sent a timely appeal of the Executive Office's denial to OIP. In its appeal, PDS explained that the provisions cited by the Executive Office do not justify withholding the requested materials. A copy of the appeal is attached to this Complaint as Exhibit 3.

51. OIP assigned the appeal number AP-2013-02087. On June 25, 2013, OIP affirmed the withholding of the requested documents, again relying on 5 U.S.C. § 552 (b)(7)(c) and the convicted sex offender's purported privacy interest. Ignoring the overriding public interest in the requested documents, it incorrectly asserted that "any records responsive to [PDS's] request would be categorically exempt from disclosure." A copy of the letter denying the appeal is attached to this Complaint as Exhibit 4.

52. The requested records are not "categorically exempt" from disclosure. Neither 5 U.S.C. § 552 (b)(7)(c) nor any other FOIA provision permits DOJ to withhold the documents requested, in part because of the overriding public interest in the documents, and in part because the convicted sex offender has little, if any, cognizable privacy interest in keeping secret his connection to the 1981 rape. He is not a person facing the specter of having his

name baselessly linked to a crime. Rather, the DNA results would, but for the statute of limitations, constitute sufficient evidence to publicly charge and prosecute the convicted sex offender for the 1981 rape. Whatever interest the convicted sex offender has in concealing behind the statute of limitations his likely connection to the 1981 rape is far outweighed by the public interest in the records. This is especially true given that for more than 30 years Mr. Odom has had his name wrongly linked to the 1981 rape, and the victim's name has long been public. Only the likely true perpetrator has had his identity concealed.

## Cause of Action

**FOIA Violation For Failure To Release Public Records Sought By Plaintiff's Request**

53.  Plaintiff repeats and realleges paragraphs 1-52.

54.  Defendant has created and/or obtained the records requested by plaintiff, including, *inter alia*, records reflecting the identity of the "convicted sex offender" whose DNA matches the DNA in the semen found on items from the scene of the 1981 rape for which Kirk Odom was wrongfully convicted.

55.  Defendant remains in control of the requested records.

56.  Defendant has improperly withheld those records.

57.  Defendant's failure to release the public records sought by plaintiff's December 4, 2012 request violates FOIA, 5 U.S.C. § 552.

**Wherefore**, plaintiff prays that this Court:

A. Enjoin the defendant from withholding the requested records;

B. Enter an order directing defendant to immediately produce the requested records to plaintiff at no cost;

C. Grant such further relief as the Court may deem just and proper.

Dated: 7/10/2013

Respectfully submitted,

_Sandra K. Levick_
Sandra K. Levick (D.C. Bar No. 358630)

_Sonam Henderson_
Sonam Henderson (D.C. Bar No. 1010801)

Public Defender Service
  for the District of Columbia
Special Litigation Division
633 Indiana Ave. N.W.
Washington, D.C. 20004
(202) 628-1200
*Attorneys for Plaintiff*